REYNOLD L. SIEMENS (Bar No. 177956)
JEFFREY A. KIBURTZ (Bar No. 228127)
COVINGTON & BURLING LLP
2029 Century Park East, Suite 3100
Los Angeles, California 90067-3044
Telephone: (424) 332-4800
Email:  rsiemens@cov.com

JILL HALEY PENWARDEN (Bar No. 178561)
RIMON, PC
One Embarcadero Center, Suite 400
San Francisco, CA 94111
Telephone: (415) 683-5472
Email:  jill.penwarden@rimonlaw.com

Attorneys for Plaintiff
FOO FIGHTERS, L.L.C.

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FOO FIGHTERS, L.L.C., | Civil Case No.:  16-cv-04208 |
| Plaintiff, | **COMPLAINT** |
| v. | <u>**DEMAND FOR JURY TRIAL**</u> |
| CERTAIN UNDERWRITERS AT LLOYD'S, LONDON AND CERTAIN LONDON MARKET INSURANCE COMPANIES, ROBERTSON TAYLOR INSURANCE BROKERS LIMITED, ROBERTSON TAYLOR INTERNATIONAL INSURANCE BROKERS, INC., and DOES 1-10, | |
| Defendants. | |

Plaintiff Foo Fighters, L.L.C. ("Band" or "Foo Fighters") alleges the following claims against Certain Underwriters at Lloyd's, London and Certain London Market Insurance Companies (collectively, "London Market Insurers" or "Insurers"), as well as Robertson Taylor Insurance Brokers Limited and Robertson Taylor International Insurance Brokers, Inc. (collectively "Robertson Taylor"), arising out of the cancellation of eleven European performances during the Band's Sonic Highways World Tour in 2015.

## THE NATURE OF THE ACTION

1.     This is a civil action arising from the refusal of defendant London Market Insurers to pay amounts due and owing to the Band under two insurance policies – a Cancellation Policy and a Terrorism Policy.

2.     As described more fully herein, London Market Insurers have failed to pay amounts that even they appear to recognize are due and owing under the Cancellation Policy in connection with seven performances that were cancelled in June 2015 after Band member Dave Grohl was injured during a performance.

3.     The London Market Insurers have also failed to pay anything under the Terrorism Policy toward losses suffered by Foo Fighters when the horrific November 2015 terrorist attacks in Paris, and specific threats to the Band, forced the cancellation of four additional shows scheduled to take place in the days immediately following the attacks.  Indeed, the Insurers have failed to pay a *single cent* toward the losses caused by the unavoidable cancellation of performances that were scheduled to take place in Paris less than 72 hours after the attacks.

4.     These were losses that London Market Insurers specifically promised to cover when the Band paid substantial premiums for the Cancellation Policy and Terrorism Policy.

5.     The damages suffered by the Band were exacerbated when the their own insurance broker, Robertson Taylor, breached its obligations by placing its interests and relationship with London Market Insurers ahead of the Band's interests, all the while

insisting that the Band "remember…that we act on YOUR behalf, not on behalf of the insurers….We are on your team and if we're joined up we are stronger as far as negotiations with insurers are concerned."  Robertson Taylor's representations in this regard were false, as further described below.

6.     On account of the breaches and improper conduct by London Market Insurers and Robertson Taylor, Foo Fighters have suffered damages in the form of losses that should have been paid under the Policies but were not, attorneys' fees and others costs incurred negotiating with the Insurers to prove the Band's entitlement to coverage, attorneys' fees and other costs the Band was forced to incur in its dispute with London Market Insurers on account of Robertson Taylor's breaches, and other consequential losses and damages subject to proof at trial.  Due to the ongoing nature of the breaches and the damages they are causing, Foo Fighters' damages are increasing with each passing day and are already many times the jurisdictional limit of $75,000.

## PARTIES

7.     Plaintiff Foo Fighters, L.L.C. is a Washington Limited Liability Company qualified to do business in California, with its principal place of business at 10510 Northup Way, Suite 300, Kirkland, WA 98033.

8.     Defendant London Market Insurers comprises individuals, unincorporated associations, partnerships and/or corporations existing under the laws of various jurisdictions, and is currently doing business in California.  London Market Insurers include Lloyd's Syndicates LIB 4472, CHB 1882, WRB 1967, PSI 1110, BRT 2987, AFB 2623, AFB 623, Swiss Re International, UK branch, and Great Lakes Reinsurance (UK) Plc, which subscribed to the Cancellation Policy, and Lloyd's Syndicates TAL 1183, BRT 2987, AFB 2623, and AFB 623, which subscribed to the Terrorism Policy.

9.     Defendant Robertson Taylor Insurance Brokers Limited is a company incorporated in the United Kingdom with its principal place of business in London, England, and is currently doing business in California.

10.     Defendant Robertson Taylor International Insurance Brokers, Inc. is a California corporation with its principal place of business in Sherman Oaks, California.

11.     Plaintiff is informed and believes that Robertson Taylor Insurance Brokers Limited and Robertson Taylor International Insurance Brokers, Inc. are related entities, are controlled by similar or overlapping persons or entities, and have at all relevant times acted as agents or alter egos of one another, directing, ordering, authorizing, ratifying and/or permitting the other to engage in the conduct giving rise to the liability alleged herein.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332, which establishes diversity jurisdiction in cases where, as here, there is complete diversity between the parties and the amount in controversy exceeds $75,000 exclusive of interest and costs.

13.     The Band is informed and believed and thereon alleges that London Market Insurers are authorized to conduct business and do conduct business as surplus lines insurers in California.

14.     Each of the Policies provides that it is subject to "Californian [sic] State Law" and designates an agent for service of process on London Market Insurers in California.

15.     Each of the Policies further provides that "in the event of a failure of the Insurers hereon to pay any amount claimed to be due hereunder, the Insurers hereon, at the request of the Assured, will submit to the jurisdiction of any Court of competent jurisdiction within the United States."

16.     London Market Insurers do business in California, and issued the Cancellation Policy and Terrorism Policy to Foo Fighters through Robertson Taylor and its California office.  Between those and other contacts with California, London Market Insurers and Robertson Taylor are subject to the personal jurisdiction of this Court.

17.     Venue is proper in this District under 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

18.     Foo Fighters are an American rock band.

19.     The Band undertook the "Sonic Highways World Tour" consisting of nearly 100 performances (the "Tour").  As is not uncommon for a tour of this magnitude, Foo Fighters purchased insurance coverage to protect against, *inter alia*, the risk that performances might need to be cancelled, including on account of injuries to band members or terrorist activities.  As discussed in greater detail below, this coverage is provided under separate policies, both of which happened to be triggered during the Tour.

### The Cancellation Policy

20.     With the assistance of its insurance broker, Robertson Taylor, the Band purchased from London Market Insurers a "Contingency Non-Appearance and Cancellation Insurance Cancellation, Abandonment, Postponement or Interruption of Events Policy" Number B0638C153925-B0638C153929 (the "Cancellation Policy").

21.     The London Market Insurers promised to pay under the Cancellation policy "70% of the Gross Guarantees and Overages and Production and Airfare/Charter/Media Contribution (where applicable) should any Insured Performance(s) or Events specified in the Tour Schedule be necessarily Cancelled, Abandoned, Postponed or Interrupted."

22.     The term "Gross Guarantee" is not specifically defined in the Policy, but on information and belief it is generally understood within the music business as meaning the minimum amount guaranteed to be paid for a given performance, regardless of ticket sales, pursuant to the band's agreement with the promoter for that performance.

23.     The term "Overages" is not specifically defined in the Policy, but on information and belief it is generally understood within the music business as meaning a band's right to receive a percentage of gross box office receipts after applicable tax and approved expenses, if that amount exceeds the Gross Guarantee.

24.     The term "Production" is not specifically defined in the Policy, but on information and belief it is generally understood within the music business as referring to

costs incurred by the band and sometimes paid directly to vendors by promoters for items including but not limited to sound, light, trucking, video, busing and staging.

25.    London Market Insurers also promised to pay under the Cancellation Policy "100% of proven additional costs and charges reasonably and necessarily paid by the Assured to avoid or diminish a loss in respect of the original Insured Performance(s) or Event(s)."

26.    The Policy defines "Cancellation or Cancelled" to mean "the inability to proceed at the Venue with any or all of the Insured Performance(s) or Event(s) prior to commencement."

27.    The Policy defines "Postponement or Postponed" to mean "the unavoidable deferment of any or all of the Insured Performance(s) or Event(s) to another time."

28.    in addition to promising coverage for "Cancelled" and "Postponed" performances, as described above, the Cancellation Policy provides that:

> Should any Insured Performance(s) or Event(s) be rescheduled, the insurers will pay:
>
> a)    100% of rescheduling costs and/or
>
> b)    any reduction in box office income resulting in a reduced Guarantee and/or income subject to (a) and (b) above not exceeding 70% of the Gross Guarantees and Overages and Production and Airfare/Charter/Freight/Media Contribution (where applicable) for the Insured Performance(s) or Event(s).  Insurers agree not to take into account savings made following cancellation of the original Insured Performance(s) or Event(s).

29.    The Cancellation Policy does not define the terms "rescheduled" or "rescheduling costs" or explain the distinction between, for example, a "Cancelled" or "Postponed" performance, on the one hand, and a "rescheduled" performance, on the other.

30.    As amended by endorsement, the Cancellation Policy provided coverage for scheduled performances taking place between January 9, 2015 and November 20, 2015. Each of the relevant performances were covered under the Cancellation Policy.

31.     Foo Fighters timely paid the substantial premiums due and owing under the Cancellation Policy and complied with all other conditions that may be imposed under the terms of the Policy.

**Dave Grohl's Injury Forces The Band To Cancel A Limited Number Of Shows**

32.     On June 12, 2015, the Band was performing at Gothenberg, Sweden, when lead singer Dave Grohl fell off the stage and suffered severe injuries to his right leg and ankle.

33.     Despite his injuries, and after a delay while Mr. Grohl received medical attention backstage, Mr. Grohl returned to the stage.  He was able to complete the June 12, 2015 performance by performing seated, with his severely injured leg and ankle elevated and braced, and with a paramedic stabilizing his ankle while he performed.

34.     Immediately upon completing the performance Mr. Grohl was rushed to the hospital where he again received medical attention.  Two days later, Mr. Grohl underwent orthopedic surgery with Dr. James Calder in London, England on June 15, 2015.

35.     Mr. Grohl's surgery and recovery from his injury would ultimately necessitate the cancellation of seven scheduled Tour performances in June 2015: at the Pinkpop Festival (June 14, 2015), AFG Arena in St. Gallen, Switzerland (June 16, 2015), Wembley Stadium, London, England (June 19 and 20, 2015), BT Murrayfield Stadium, Edinburgh (June 23, 2015), Festivalpark Werchter, Belgium (June 25, 2015), and the Glastonbury Festival (June 26, 2015).

36.     Shortly after Mr. Grohl's injury, and before announcing the cancellation of the aforementioned performances, London Market Insurers were notified of the circumstances.

37.     Following consultation with London Market Insurers, on June 13, 2015 Foo Fighters publicly announced the cancellation of their performances at Pinkpop Festival and AFG Arena.

38.     After a series of discussions and emails with Robertson Taylor, acting as the agent for providing notice to London Market Insurers, Foo Fighters received a message

on June 16, 2015 stating that "the lead insurers have now confirmed that they agree to the cancellation of the remaining European concerts." Promptly thereafter, on June 16, 2015, the Band publicly announced in a press release that all of the Band's remaining June 2015 performances were "cancelled." Refunds were provided to ticket holders for the AFG Arena, Wembley Stadium, and BT Murrayfield Stadium Foo Fighters performances.[1] All monies previously received by the Band in advance of those cancelled performances were refunded to the promoters almost immediately.

39. Despite the serious nature of his injuries, and notwithstanding the Insurers' agreement to the cancellation of the remaining European concerts, Mr. Grohl began considering options for how to play as many of the remaining shows as possible. Following his physician's orders to refrain from standing on his injured leg, Mr. Grohl devised a dramatic, stadium-worthy mechanical chair, nicknamed a "throne."

40. With a daily regime of physical therapy, which required a physician-recommended physical therapist to travel with him at all times, Mr. Grohl was able to perform while seated in the throne and with the aid of crutches at 53 performances from July 4, 2015 through the end of the Tour in November 2015.

41. Upon learning that Mr. Grohl was considering performing in spite of his injuries and during his rehabilitation, and reflective of the substantial savings his grit would provide to the Insurers, the London Market Insurers communicated through Robertson Taylor that:

> the feedback . . . from London has been very favorable from underwriters point of view. They are looking at Dave's actions with 'Great Intent.' Let's face it, the guys a Beast!

42. Similar messages of gratitude for Mr. Grohl's perseverance would be repeated on several occasions throughout the balance of the Tour. Such expressions

---

[1] Festival ticket holders did not receive refunds because the three festivals still went forward without Foo Fighters' performance.

reflect, in part, that Foo Fighters' decision to continue playing saved the London Market Insurers tens of millions of dollars in claim payments that would have been owing had Foo Fighters simply cancelled the balance of the tour, which would have been easily justifiable under the circumstances.

43.    Foo Fighters resumed the Tour on July 4, 2015 at RFK Stadium in Washington, D.C. as a test for whether Mr. Grohl's injuries would be exacerbated by performing.  Following that performance, and based on a physician's assessment, Foo Fighters confirmed that the balance of the Tour could go forward provided that Mr. Grohl remained off his injured ankle and leg, observed his physical therapy regime, and checked in regularly with his physicians.

## LMI And Robertson Taylor's Tortious Handling Of The Cancellation Claim

44.    Given the plain language of the Cancellation Policy, Foo Fighters reasonably expected that the Policy would provide them coverage for the seven cancelled performances in the amount of at least 70% of the Gross Guarantees and Overages and Production and Airfare/Charter/Freight/Media Contribution (as defined in the Policy) for each performance, as expressly promised in Insuring Clause 1.1 of the Policy.

45.    The London Market Insurers apparently had other ideas.  After paying certain amounts owed under the Cancellation Policy for four of the cancelled performances, they began searching for ways to limit their payment obligations on the other three performances, including the two Wembley Stadium shows, which represented the largest potential gross income of the Tour.

46.    After five successful shows in the throne, successful physical therapy and positive feedback from Mr. Grohl's physicians, the Band announced on July 13, 2015 that it would be adding new performances at Milton Keynes National Bowl, England on September 5 and 6, 2015, and at BT Murrayfield Stadium, Edinburgh, Scotland on September 8, 2015.

47.    In addition to relying on Robertson Taylor to interface and negotiate with London Market Insurers concerning coverage for the already cancelled performances, as

discussed elsewhere, Foo Fighters also sought the assistance of Robertson Taylor in securing new insurance for these performances.

48.   But despite numerous discussions, Robertson Taylor failed to adequately advise the Band of the potential impact these additional shows could have on their claim for coverage for the losses already suffered in connection with the previously cancelled performances.  Specifically, Robertson Taylor failed to adequately inform the Band that, if it decided to add these shows to the Tour, the London Market Insurers would attempt to recharacterize the cancelled Wembley Stadium and BT Murrayfield Stadium performances *from* "Cancelled" or "Postponed" (which afford the Band full coverage) *to* "rescheduled" (which, according to London Market Insurers, could mean that the Insurers would pay less).

49.   Worse yet, Robertson Taylor failed to disclose that, if the Band decided to add these shows, Robertson Taylor would affirmatively assist the London Market Insurers in characterizing them as "rescheduled" by, *inter alia*, preparing and ostensibly authorizing on behalf of Foo Fighters purported endorsements to the Cancellation Policy that recharacterized the Milton Keynes National Bowl and BT Murrayfield Stadium performances as "rescheduled," while simultaneously concealing from the Band the fact that those endorsements had been issued.

50.   Nevertheless, and incurring significant additional expenses, Foo Fighters added three new shows to the already-packed tour itinerary.  New contracts were entered, new tickets were sold, and new travel, lodging and other arrangements for a return to Europe for the additional performances.

51.   But as the date approached for these shows the insurance situation remained unclear.  Indeed, despite numerous discussions, the London Market Insurers—acting through Robertson Taylor—did not confirm that Foo Fighters had insurance for the performances until September 3, 2015, less than two days before the first show at Milton Keynes National Bowl was scheduled to take place.

52.     Even then, neither Robertson Taylor nor London Market Insurers disclosed to the Band the complete terms under which that coverage was being offered.

53.     Unknown to Foo Fighters, Robertson Taylor had previously prepared a purported endorsement to the Cancellation Policy, Endorsement No. 008, with an effective date of July 9, 2015 ("Endorsement 8"), describing the Milton Keynes National Bowl and BT Murrayfield Stadium concerts as "rescheduled" performances.  Stamps from the London Market Insurers indicate that they approved the endorsement on July 9, 2015.  Foo Fighters did not learn of the existence of purported Endorsement 8 until long after the Milton Keynes National Bowl and BT Murrayfield Stadium shows were concluded.

54.     Also unknown to Foo Fighters, Robertson Taylor prepared another purported endorsement to the Cancellation Policy, Endorsement No. 011, with an effective date of September 3, 2015 ("Endorsement 11").  Like Endorsement 8, purported Endorsement 11 describes the Milton Keynes National Bowl and BT Murrayfield Stadium concerts as "rescheduled" performances.  Stamps from the London Market Insurers indicate that they approved the endorsement on September 3, 2015.  Foo Fighters did not learn of the existence of purported Endorsement 11 until long after the Milton Keynes National Bowl and BT Murrayfield Stadium shows were concluded.

55.     In retrospect it appears that, as discussed in greater detail below, during the July through September 2015 period Robertson Taylor was quietly working with the London Market Insurers to implement a scheme to recharacterize the new BT Murrayfield Stadium and Milton Keynes National Bowl performances as "rescheduled" from the previously "Cancelled" designation, without consulting with or advising Foo Fighters that such characterization would become the asserted basis by the Insurers for delays in payment and a dramatic reduction in the value of the claim.

56.     For instance, on September 2, 2015, while purporting to be acting on behalf of Foo Fighters in their efforts to secure payment for the cancelled performances, Robertson Taylor promised in an email to Foo Fighters that if they could summarize their

costs they had already incurred, the London Market Insurers would promptly pay the claim:

> The Loss Adjuster has agreed that if we can show to him a summary of the current position confirming that the costs exceed the 70% figure, then he may be able to finalise your claim at this stage, without the need for a full audit once the shows have taken place. He will still need to review a sample of the estimates, but it would not be necessary to provide all of the invoices.

57.    Despite Foo Fighters providing the requested information, the London Market Insurers did not pay as promised.  Rather, it appears Robertson Taylor and the London Market Insurers were using the promise of a prompt payment as pretense for securing information about the claim.

58.    As another example from that same time period, Robertson Taylor engaged the Band in a discussion that, in retrospect, appears to have been intended to distract attention from Robertson Taylor's double-dealing and to give the false impression that moving forward with the Milton Keynes National Bowl and BT Murrayfield Stadium performances would not compromise Foo Fighters' claim for coverage.

59.    Responding to a question from the Band about why the cancelled Wembley Stadium and BT Murrayfield Stadium performances would not be considered either "Cancelled" or "Postponed" for purposes of coverage under the Cancellation Policy, on September 1, 2015 Robertson Taylor shared the London Market Insurers' view that they might consider a performance "rescheduled"—and therefore subject to potentially dramatically reduced coverage—even if it otherwise fit within the Policy's definitions of a "Cancelled" or "Postponed" performance:

> I am not trying to teach my granny here but a postponement occurs rarely. Perhaps most frequently when adverse weather or travel delay may prevent the performance/event going ahead on the scheduled date and possibly being held 24 hours later. I appreciate there is nothing that says the postponed performance/event has to take place within a certain time frame but it is known at the time of loss that the performance/event is postponed to a later date. In other words, the Performance/Event is unavoidably deferred to another time….
>
> I agree that a postponed performance/event can later become a cancelled event.

… If a performance/event cannot go ahead for whatever reason and it is not known at that time whether or not the performance/event will be taking place at some future point, it is cancelled. If it subsequently transpires the performance/event can take place at another time it is cancelled and rescheduled.

60.     Responding to the point that such an interpretation would render illusory the Policy's promise of full coverage for "Postponed" events, Robertson Taylor responded on September 1, 2015 that it had "raised this issue with the loss adjuster, as this is an interesting point, and to an extent calls into question the interpretation of the wording versus customs and practice."  While this appears to have been an open acknowledgment that the Cancellation Policy is ambiguous on this point, given that Robertson Taylor had already generated Endorsement 8 characterizing the performances as "rescheduled" this communication was at best disingenuous and, at worse, indicative of an intent to mislead Foo Fighters into believing the characterization of the performances remained an open issue from the perspective of the London Market Insurers.

61.     The Band played the Milton Keynes National Bowl and BT Murrayfield Stadium shows as scheduled.

62.     The notion that the Milton Keynes National Bowl performances were effectively the same performances as the originally-scheduled Wembley Stadium performances, and were not "cancelled" but were only "rescheduled" to a later date, is without merit.

63.     Milton Keynes National Bowl was the best available venue for the narrow window of time in which Foo Fighters could sandwich the new concerts.  However, Milton Keynes National Bowl is a much smaller venue than Wembley Stadium.  Milton Keynes National Bowl is an open-air amphitheater where all tickets to Foo Fighters' performance were general admission, while Wembley Stadium would have provided both reserved seating and general admission tickets.  Milton Keynes National Bowl is 55 miles from central London, in the northern part of the County of Buckinghamshire, whereas Wembley Stadium is readily accessible to central London.  The difference in ticket sales was substantial: whereas Foo Fighters sold nearly 150,000 tickets when the performances

were scheduled for Wembley Stadium, less than 110,000 were sold for the Milton Keynes National Bowl performances, a difference of nearly 42,000 tickets.

64.   Under custom and practice in the industry, there is no reasonable dispute that the performances were "cancelled." New tickets were sold for the new dates. Refunds were provided to ticket holders for the Wembley Stadium and BT Murrayfield Stadium performances. No credits or exchanges were provided to holders of tickets for the cancelled shows.

65.   Despite the foregoing, the London Market Insurers assert that the original Wembley Stadium and BT Murrayfield Stadium performances were "rescheduled," not "Cancelled" or "Postponed" within the meaning of the Cancellation Policy, and therefore the only payments required under the policy are for "rescheduling" costs. But even if "rescheduling" costs were the only item owed under the policy, the London Market Insurers have failed to pay even those amounts.

66.   In addition to failing to pay amounts even they seemingly acknowledge are owed, the London Market Insurers have engaged in a range of dilatory tactics from seeking detailed information not reasonably required to assess the merits of the claim to conditioning any offer of settlement on the Band's first waiving its right to sue the Insurers for acting in bad faith if they made a low-ball settlement offer.

67.   Indeed, even though it has been an entire year since Mr. Grohl was injured, the London Market Insurers have yet to pay significant portions of the Band's claim, even amounts that appear to be indisputably owed.

68.   The London Market Insurers' unfair and unreasonable handling of the claim has not only deprived the Band of the benefits promised by the Cancellation Policy, but also forced the Band to incur the substantial cost of retaining attorneys to vindicate its rights under the policy.

**The Terrorism Policy**

69.   Foo Fighters also purchased from London Market Insurers a "Contingency Non-Appearance and Cancellation Insurance Cancellation, Abandonment, Postponement

or Interruption of Events Caused By Terrorism Policy" Number B0638C153924 (the "Terrorism Policy").  London Market Insurers offered, and through Robertson Taylor encouraged Foo Fighters to purchase, an expensive policy for cancellation of shows due to actual, perceived, or threatened terrorism and associated events such as a period of National Mourning following a terrorist attack.

70.     Under that Policy, the London Market Insurers promised to pay:

. . . Ascertained Net Loss should an Insured Performance(s) or Event(s) specified in the Tour Schedule be necessarily Cancelled, Abandoned, Postponed, Interrupted, Curtailed or Relocated as a direct result of

1.1.1  Terrorism and/or Sabotage…

whether actual or perceived and including the threat thereof

. . . .

1.1.4  National Mourning resulting from any insured peril specified above…

and subject to the circumstance giving rise to the loss first occurring during the Period of Insurance stated in the Schedule.

71.     "Ascertained Net Loss" is defined as follows:

. . . sums in excess of any deductible stated in the schedule as represent:

2.1.1  that part of the Expenses which have been irrevocably expended in connection with the Insured Performance(s) or Event(s), less such part of the Gross Revenue received or receivable less any savings the Assured is able to effect to mitigate such loss and

2.1.2  the reduction in Profit (when Profit is insured and stated in the Schedule) which the Assured can satisfactorily prove would have been earned had the Insured Performance(s) or Event(s) taken place."

72.     "Terrorism" is defined as "an unlawful act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organization(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public or any section of the public in fear, including the performer(s), the event organizer(s), and any other participants of the Insured Performance(s) or Event(s)."

73.     "Cancellation or Cancelled" are defined as "the inability to proceed at the Venue with any or all of the Insured Performance(s) or Event(s) prior to commencement."

74.     The London Market Insurers further promised to pay "for additional costs or charges reasonably and necessarily paid by the Assured to avoid or diminish a loss herein insured."

75.     As amended by endorsement, the Terrorism Policy was in effect from January 12, 2015 through November 20, 2015.

76.     Each of the relevant performances were covered under the Terrorism Policy.

77.     Foo Fighters timely paid the substantial premiums due and owing under the Terrorism Policy and otherwise complied with all other conditions that may be imposed under the terms of the Policy, including by providing prompt notice in the manner specified and otherwise keeping the London Market Insurers apprised through Robertson Taylor, their designated agent for purpose of receiving notice and communications concerning events.

## The Paris Terror Attacks Of November 2015

78.     Foo Fighters were scheduled to perform in Turin, Italy on November 14, 2015; Paris, France, on November 16, 2015; Lyon, France on November 17, 2015; and Barcelona, Spain, on November 19, 2015.  These were the last four scheduled performances of the nearly 100 performance Sonic Highways Tour.

79.     On November 13, 2015 there was a series of coordinated terrorist attacks in Paris, France (the "Attacks").  News reports indicated that approximately 130 people were killed, and 350 wounded, in the Attacks.

80.     Of the 130 people killed in the Attacks, 89 people were killed at the Bataclan, where an American rock band was playing.  Shortly after the band started playing, three heavily-armed terrorists entered the Bataclan and began shooting indiscriminately into the crowd.  The band, crew, and any concertgoers who were able

ran for their lives or tried to hide.  Over a period of several hours, the terrorists patiently, mercilessly, and methodically shot to death anyone in the theater, often executing victims who continued to show signs of life.  When the French police finally entered the building behind metal shields, hours after the attacks began, they shot one terrorist, after which the remaining two terrorists blew themselves up with suicide vests.

81.     According to CNN, after the initial wave of killing, the gunmen stopped and asked each other:  "Where is the singer? Where are those Yanks? It's an American group, you're bombing us with the Americans, so we're going to hit the Americans and you."  A crewmember of the band playing that night was among those killed.

82.     Survivors of the Bataclan terrorist attack described wading through pools of blood and climbing over dead bodies to escape the grisly theater.

83.     On November 14, 2015, the Islamic State militant jihadist group, also known as "Islamic State", "ISIL" or "ISIS," claimed responsibility for the Attacks.  ISIS is known for inflicting mass casualties through terrorist attacks as well as its videos of beheadings of prisoners.  ISIS has been designated as a terrorist organization by the United Nations, the European Union, the United States, and many other countries.

84.     On November 14, 2015, President Hollande of France announced a three-day period of National Mourning, the imposition of a State of Emergency, and that the borders of France would be closed, as a result of the Attacks and fear of further attacks.

85.     On November 15, 2015, the United States Embassy in Paris issued a "Security Message for U.S. Citizens" stating that the "authorities believe the likelihood of terror attacks in Europe will continue as European members of ISIL return from Syria and Iraq" and that "there is a continuing threat in Europe from unaffiliated persons planning attacks inspired by major terrorist organizations but conducted on an individual basis."

86.     Also on November 15, 2015, the United States Embassy in Paris reported that "[p]ublic events in Paris have been cancelled, and public monuments, tourist sites, and many retail outlets may remain closed."

87.     On November 16, 2015, the United States Department of Defense's European Command announced a travel ban prohibiting unofficial travel within France by all Department of Defense personnel and their families.

88.     News reports indicated that in Lyon, France on November 16, 2015 (the day before Foo Fighters' scheduled performance in that city), in an anti-terror raid, French police arrested five people and seized a rocket launcher, bulletproof vests, and a Kalashnikov assault rifle.

89.     News reports indicated that on November 17, 2015, "serious plans for explosions" forced the evacuation of a stadium in Hannover, Germany, where a soccer match had been scheduled.  On that same date, two Air France flights from the United States to Paris were diverted due to bomb threats.

90.     On November 19, 2015, ISIS released a video threatening additional attacks in Europe.

91.     On November 20, 2015, the French government extended the State of Emergency in France for an additional three months.  To this day, France remains under a national State of Emergency.

92.     News reports indicate that between November 13 and 20, 2015, French authorities carried out hundreds of raids and seized weapons arsenals, including "at least 18 weapons of war" according to a Wall Street Journal article dated November 21, 2015.

### The Insurers' And Robertson Taylor's Tortious Handling Of The Terrorism Claim

93.     Foo Fighters' performance in Turin was scheduled to take place less than 24 hours after the Attacks.

94.     As the Band assessed the situation on November 14, 2015, Foo Fighters learned that the website, www.foofighterstours2015.com, had been hacked to display a chilling image (attached as Exhibit A) depicting the ISIS flag, an automatic weapon, a terrorist, and the following threat of violence:

I love you Islamic State & Jihad

Islamic State remain and expand, God willing

We will restore the dignity of Muslims

Glory will return to Islam…

*Be prepared*

95.     This threat ("Threat") was claimed by the hacker collective "Team System DZ" and was forwarded to the FBI cyber division. Team System DZ are known ISIS sympathizers who hack websites globally to spread pro-ISIS statements. In light of the warning to "be prepared" specifically directed by a Pro-ISIS group at Foo Fighters, in an environment of fear of further terror attacks throughout Europe, the band cancelled the final four performances of the Tour (Turin, Paris, Lyon, and Barcelona). This difficult decision was made out of concern not only for the safety of the band, their fans and crew, but also due to the potential impossibility of traveling in the wake of the Attacks across the closed borders of France, or within Europe generally—let alone with a massive convoy of approximately 120 people on 10 buses, and 14 semi trucks filled with sound, lighting, staging equipment and more.

96.     Foo Fighters promptly provided notice to London Market Insurers as specified in the Policy that the Turin, Italy; Paris, France; Lyon, France; and Barcelona, Spain performances were being cancelled due to the Attacks and the Threat.

97.     Given the plain language of the Policy, the dire circumstances at hand and assurances from Robertson Taylor, Foo Fighters reasonably expected that the Terrorism Policy would provide them coverage for the four November 2015 performances, which were necessarily cancelled as a direct result of terrorism, in the amount of their Ascertained Net Loss for each performance, as promised in Insuring Clause 1.1 of the Policy.

98.     While London Market Insurers have engaged in a seemingly never-ending series of requests for increasingly irrelevant information, particularly as to the necessity of cancelling the Turin and Barcelona performances, they have not provided Foo Fighters

with any indication that they dispute coverage for the cancellation of the Paris, France and Lyon, France performances.

99.    The Band is informed and believes, and on that basis alleges, that London Market Insurers do not dispute coverage for the cancellation of the Lyon and Paris performances.

100.   To date, seven months later, however, London Market Insurers have not paid or offered to pay a single penny of Foo Fighters' terrorism coverage claim.

101.   The Band is informed and believes, and on that basis alleges, that London Market Insurers contend that the cancellation of either or both the Turin and/or Barcelona performances do not bear a sufficient connection to the Attacks and the Threat to be covered under the Terrorism Policy.  The Band is informed and believes, and on that basis alleges, that such position has been developed by the loss adjuster that Robertson Taylor instructed on behalf of London Market Insurers and with the advice, guidance and/or input of Robertson Taylor.  London Market Insurers have not, however, conveyed any inkling of their coverage decision, leaving Foo Fighters in the dark in violation of the custom and practice of the insurance industry and California regulations applicable to the handling of claims.

102.   London Market Insurers have requested on multiple occasions that Foo Fighters waive its right to have its claim handled fairly and in good faith by signing what its lawyers refer to as a "*White* waiver."

103.   London Market Insurers' inconsistent, erratic and unreasonable behavior partially detailed above has caused significant financial harm to Foo Fighters.  The Insurers' failure to fulfill their coverage obligations has forced Foo Fighters to incur ongoing legal fees and now to litigate to obtain the benefits of coverage.

### Robertson Taylor's Double-Dealing

104.   The Policies state that Robertson Taylor Insurance Brokers Limited is a "fully accredited Lloyd's broker" and is authorized to arrange and advise on general insurance contracts.  This means, among other things, that Robertson Taylor is authorized

to act on behalf of Lloyd's insurers and underwriters to bind coverage, draft and issue policy wordings on their behalf, and direct their adjustment of claims.

105.   Each of the Policies nevertheless represents that "[w]hen administrating business under this Contract Robertson Taylor are acting as Agent for the Assured."

106.   Despite the latter representations, Foo Fighters is informed and believes, and on that basis alleges, that Robertson Taylor has acted on behalf of London Market Insurers in connection with the Band's claim for coverage.  These acts included, on information and belief, retaining a loss adjuster on behalf of London Market Insurers (believed to be Howard Diamant of Focus Claim & Risk Management), acting as an intermediary between the Insurers and the loss adjuster, providing the loss adjuster with facts supportive of and/or deleterious to coverage, rendering advice to the loss adjuster concerning interpretations of the Policies and/or the availability or non-availability of coverage, drafting and issuance of endorsements the Insurers have invoked as reducing or minimizing their obligations under the Policies, and advocating interpretations of the Policies designed to minimize the amounts payable by the Insurers rather than maximize the coverage available to the Band.

107.   Despite having an extensive relationship with the London Market Insurers that included, *inter alia*, instructing a loss adjuster on their behalf, Robertson Taylor affirmatively represented that it was acting solely on behalf of the Band without disclosing the nature and extent of its relationship with the Insurers.  For instance, on November 18, 2015, Robertson Taylor sent Foo Fighters an email in which it urged the Band to "remember…that we act on YOUR behalf, not on behalf of the insurers….We are on your team and if we're joined up we are stronger as far as negotiations with insurers are concerned."  Robertson Taylor confirmed this again on January 27, 2016, stating "[a]s I/we have said many times, we are on the band's team."

108.   Robertson Taylor's responsibilities and duties under these circumstances are different from, and substantially more expansive than, the ordinary duties a broker ordinarily undertakes when acting solely as an intermediary for placing insurance.  In

particular, Robertson Taylor undertook a fiduciary duty by, *inter alia*, holding itself out as acting, and purporting to act, on behalf of Foo Fighters when issuing endorsements to the Cancellation Policy or negotiating the Band's claim for coverage under both policies as more fully described herein.

109.   The Band is informed and believes, and on that basis alleges, that Robertson Taylor breached its duties by, *inter alia*, engaging in a scheme to recharacterize cancelled shows as "rescheduled," issuing allegedly coverage-destroying endorsements purportedly on behalf of Foo Fighters without their consent, knowledge and/or against their express instructions to the contrary, concealing from the Band that the endorsements had been issued, instructing the loss adjuster that certain aspects of the Band's claim may or should not be covered, and other harmful conduct that may be revealed during discovery in this action.

110.   Contrary to its own affirmative representations, and the obligations placed on it by law, by acting in the manner alleged above Robertson Taylor has not acted as a faithful agent for and in the interests of Foo Fighters, but rather has acted on behalf of the Insurers in connection with many if not most aspects of Foo Fighters dealings with London Market Insurers.

111.   Had Robertson Taylor disclosed the true nature of its relationship with the Insurers, and its loyalty to them, Foo Fighters would have acted sooner to protect its interests by, *inter alia*, objecting to the purported issuance of Endorsement Nos. 8 and 11 and preventing Robertson Taylor's deleterious meddling in the Bands coverage claims.

112.   But because Robertson Taylor concealed these facts, and affirmatively represented that it was acting solely in the interest of Foo Fighters, the Band has suffered losses subject to proof at trial which may include, among other damages, a loss of coverage if, as the London Market Insurers contend, Endorsement Nos. 8 and 11 are dispositive of whether the Milton Keynes National Bowl and BT Murrayfield Stadium shows are considered "rescheduled" under the Cancellation Policy.

# FIRST CLAIM
## FOR DECLARATORY RELIEF
### AGAINST LONDON MARKET INSURERS SUBSCRIBING TO THE CANCELLATION POLICY

113.   Foo Fighters repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

114.   Foo Fighters allege that the June 2015 Wembley Stadium and BT Murrayfield Stadium performances were "Cancelled" or "Postponed" within the meaning of the Cancellation Policy.

115.   Foo Fighters allege that the Cancellation Policy requires London Market Insurers to pay its claim including but not limited to 70% of Gross Guarantees and Overages and Production and Airfare/Charter/Freight/Media Contribution for the June 2015 Wembley Stadium and BT Murrayfield Stadium performances, plus its Additional Costs incurred to avoid or diminish further loss following Dave Grohl's injury.

116.   Alternatively, Foo Fighters allege that the Cancellation Policy and its terms, including but not limited to the terms "Cancelled," "Postponed," "rescheduled," and "rescheduling costs," are ambiguous and conflicting and that any ambiguity must be construed for the benefit of Foo Fighters and to provide the greatest amount of coverage for Foo Fighters' losses.

117.   The Band is informed and believes, and on that basis alleges, that London Market Insurers dispute the foregoing either in whole or in part.

118.   By reason of the foregoing, an actual and justiciable controversy presently exists between Foo Fighters and London Market Insurers regarding the extent of coverage for Foo Fighters' claims under the Cancellation Policy.

119.   A judicial determination of this controversy is necessary and appropriate for the parties to ascertain their respective rights and duties under the Cancellation Policy.

## SECOND CLAIM

## FOR DECLARATORY RELIEF

## AGAINST LONDON MARKET INSURERS SUBSCRIBING TO THE

## TERRORISM POLICY

120.   Foo Fighters repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

121.   Foo Fighters allege that the November 2015 performances were "necessarily Cancelled" as a direct result of Terrorism within the meaning of the Terrorism Policy, and that the Terrorism Policy requires London Market Insurers to pay Foo Fighters' Ascertained Net Loss for the Turin, Paris, Lyon, and Barcelona performances, plus its Additional Costs incurred to avoid or diminish further loss and all other policy benefits.

122.   The Band is informed and believes, and on that basis alleges, that London Market Insurers dispute the foregoing either in whole or in part.

123.   By reason of the foregoing, an actual and justiciable controversy presently exists between Foo Fighters and London Market Insurers for Foo Fighters' claims under the Terrorism Policy.

124.   A judicial determination of this controversy is necessary and appropriate for the parties to ascertain their respective rights and duties under the Terrorism Policy.

## THIRD CLAIM

## FOR BREACH OF CONTRACT AGAINST LONDON MARKET INSURERS

## SUBSCRIBING TO THE CANCELLATION POLICY

125.   Foo Fighters repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

126.   The Cancellation Policy constitutes a written contract under which London Market Insurers agreed, in consideration of the premiums paid, to provide certain insurance benefits to Foo Fighters.

127.   London Market Insurers were and are obligated to provide certain insurance benefits to Foo Fighters in connection with Dave Grohl's injury and the June 2015

performances, including but not limited to 70% of the Gross Guarantees and Overages and Production and Airfare/Charter/Freight/Media Contribution for the Wembley Stadium (June 19 and 20, 2015) and BT Murrayfield Stadium (June 23, 2015) performances, and the Additional Costs paid by Foo Fighters to avoid or diminish further loss following Dave Grohl's injury for the remainder of the Tour.

128.   Foo Fighters have incurred amounts in excess of the applicable deductible, thereby triggering London Market Insurers' duty to pay under the Policy.

129.   London Market Insurers have breached and continue to breach their contractual obligations by, *inter alia*, refusing to pay amounts admittedly due and owing under the Cancellation Policy, clearly and positively indicating that they will not pay other amounts covered by the Cancellation Policy, and/or by unfairly interfering with Foo Fighters' rights to receive benefits under the Cancellation Policy.

130.   As a direct and proximate result of London Market Insurers' breach of contract, which is continuing to this date, Foo Fighters have been damaged in an amount to be proven at trial.

## FOURTH CLAIM

## FOR BREACH OF CONTRACT AGAINST LONDON MARKET INSURERS SUBSCRIBING TO THE TERRORISM POLICY

131.   Foo Fighters repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

132.   The Terrorism Policy constitutes a written contract under which London Market Insurers agreed, in consideration of the premiums paid, to provide certain insurance benefits to Foo Fighters.

133.   London Market Insurers  were and are obligated to provide certain insurance benefits in connection with the Cancellation of Foo Fighters' November 14-19, 2015 performances, including but not limited to its Ascertained Net Loss (including expenses irrevocably expended, and reduction in profit) for those performances, and the Additional Costs paid by Foo Fighters to avoid or diminish further loss.

134.   Foo Fighters have incurred amounts in excess of the applicable deductible, thereby triggering London Market Insurers' duty to pay under the Policy.

135.   London Market Insurers have breached and continue to breach their contractual obligations by, *inter alia*, refusing to pay amounts admittedly due and owing under the Terrorism Policy, clearly and positively indicating that they will not pay other amounts covered by the Terrorism Policy, and/or by unfairly interfering with Foo Fighters' rights to receive benefits under the Terrorism Policy.

136.   As a direct and proximate result of London Market Insurers' breach of contract, which is continuing to this date, Foo Fighters have been damaged in an amount to be proven at trial.

### FIFTH CLAIM

### FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### AGAINST LONDON MARKET INSURERS

137.   Foo Fighters repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

138.   Foo Fighters have suffered losses that are covered under the Policies. Despite having been notified of those losses, London Market Insurers have unreasonably and without justification refused to provide and/or delayed the payment of policy benefits, as further detailed herein.  London Market Insurers' unreasonable refusal to timely provide policy benefits due and owing to Foo Fighters resulted in substantial economic harm suffered by Foo Fighters, including but not limited to harm occasioned by being forced to pay attorneys to vindicate their rights under the Policies, amounts that the Insurers should have paid under the Policies, and the loss of use of the funds expended.

139.   Implied in each of the Policies is a covenant that London Market Insurers would, *inter alia*, act in good faith and deal fairly with Foo Fighters, that they would do nothing to interfere with Foo Fighters' right to receive the benefits of the Policies, that they would not place their interests ahead of their insured, that they would not force their

insured to litigate to obtain the benefits of the Policies, that the Insurers would not seek information not reasonably necessary to the adjustment of the claim, and that they would generally treat Foo Fighters fairly and in good faith.  Instead of complying with these duties, London Market Insurers have breached the implied covenant of good faith and fair dealing by:

a.   refusing to acknowledge their duty to indemnify Foo Fighters without a reasonable basis or adequate justification;

b.   taking positions regarding their obligations that they knew or reasonably should have known were contrary to the expressed, reasonable expectations of Foo Fighters and/or the mutual intent of the parties to the insurance contract;

c.   deciding without any reasonable basis in fact or law, and for their own purposes and to serve their own desires, to take unreasonable positions concerning the meaning of the Policies;

d.   construing facts to support their own position rather than construing the facts in favor of coverage as required by law;

e.   intentionally and willfully refusing to respond in a meaningful fashion to requests that they honor their obligations under the Policies to pay the benefits due thereunder;

f.   failing to promptly pay the undisputed portion of Foo Fighters' claims;

g.   unreasonably delaying in responding to Foo Fighters' requests for payment of policy benefits;

h.   deliberately failing to conduct a reasonable and thorough investigation of the facts and claims and of possible bases for coverage, all in violation of accepted insurance industry custom, practice and standards, and its duties to Foo Fighters; and

i.   forcing its insured to litigate to obtain benefits under the Policies.

140.   London Market Insurers committed the acts alleged above for the purpose of consciously withholding from Foo Fighters the rights and benefits to which the Band is entitled under the Policies.

141.   The Insurers' acts are inconsistent with the reasonable expectations of the insured, are contrary to established norms, practices and legal requirements related to insurance claims, are contrary to the express terms of the Policies, and constitute a breach of the implied covenant of good faith and fair dealing.

142.   The Band is informed and believes and thereon alleges that Insurers' acts were performed, authorized and/or ratified by their officers, directors, and/or managing agents, and/or with the advance knowledge or conscious disregard of its officers, directors, and/or managing agents.

143.   London Market Insurers' conduct is despicable and has been done with a conscious disregard of Foo Fighters' rights, constituting oppression, fraud and/or malice, in that the Insurers engaged in a series of acts designed to deny the benefits due or that it reasonably expected would be due under the Policies.  Specifically, in light of information, facts, and relevant law to the contrary, London Market Insurers, by acting as alleged above and as will be proved at trial, have consciously disregarded Foo Fighters' rights and forced them to incur substantial and oppressive financial losses, have misrepresented the nature of coverage provided by the policy and have intentionally inflicted financial harm on Foo Fighters in an effort to avoid their obligations under the policy.  The conduct alleged herein amounts to oppressive, malicious and fraudulent conduct within the meaning of California Civil Code Section 3294.  Therefore, the Band is entitled to recover punitive damages from London Market Insurers in an amount sufficient to punish the Insurers and to deter similar conduct in the future.

144.   As a direct and proximate result of London Market Insurers' breaches and violations, Foo Fighters have suffered and continues to suffer substantial damages, in an amount exceeding the jurisdictional minimum of this Court, and to be determined at trial. Such damages include, among other things, amounts that should have been paid under the

Cancellation Policy, loss of use of funds, and the cost to prove Foo Fighters' entitlement to coverage, which are recoverable under *Brandt v. Superior Court*, 37 Cal. 3d 813 (1985).

## SIXTH CLAIM
## FOR BREACH OF FIDUCIARY DUTY
## AGAINST ROBERTSON TAYLOR

145.   Foo Fighters repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

146.   Each of the Robertson Taylor defendants had a fiduciary duty to Foo Fighters with respect to the Policies, including but not limited to a fiduciary duty when purchasing coverage, negotiating endorsements to those Policies, and in administering Foo Fighters' claims under the Policies.

147.   Each of the Robertson Taylor defendants breached its fiduciary duty to Foo Fighters by, *inter alia*, acting to benefit the Insurers, not Foo Fighters, in its acts and omissions as a broker between Foo Fighters and London Market Insurers as set forth in detail herein, including but not limited to the negotiation of policy endorsements and administering Foo Fighters' claims.

148.   As a result of Robertson Taylor's breaches of fiduciary duty, Foo Fighters have incurred damages in an amount to be proven at trial.

149.   The Band is informed and believed and thereon alleges that Robertson Taylor's acts were performed, authorized and/or ratified by their officers, directors, and/or managing agents, and/or with the advance knowledge or conscious disregard of its officers, directors, and/or managing agents.

150.   Robinson Taylor's conduct is despicable and has been done with a conscious disregard of Foo Fighters' rights, constituting oppression, fraud and/or malice, in that the Robinson Taylor has consciously disregarded Foo Fighters' rights and forced them to incur substantial and oppressive financial losses, has misrepresented the nature and extent of its relationship with and loyalty to London Market Insurers, and has intentionally

inflicted financial harm on Foo Fighters in an effort to advance its own interests and those of London Market Insurers.  The conduct alleged herein amounts to oppressive, malicious and fraudulent conduct within the meaning of California Civil Code Section 3294.  Therefore, the Band is entitled to recover punitive damages from Robertson Taylor in an amount sufficient to punish it and to deter similar conduct in the future.

**SEVENTH CLAIM**

**FRAUDULENT CONCEALMENT**

**AGAINST ROBERTSON TAYLOR**

151.   Foo Fighters repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

152.   Robertson Taylor concealed the material fact that it was not acting for the benefit of Foo Fighters, but in truth was acting for the benefit of London Market Insurers.

153.   Robertson Taylor purported to be the "agent" of Foo Fighters and had a duty to disclose to Foo Fighters that it was not acting for the benefit of Foo Fighters, but in truth was acting for the benefit of the Insurers.

154.   Robertson Taylor intended to defraud Foo Fighters by intentionally concealing and suppressing the fact that it was not acting for the benefit of Foo Fighters, but in truth was acting for the benefit of the Insurers.

155.   Foo Fighters were unaware that Robertson Taylor was not acting for their benefit, but in truth was acting for the benefit of London Market Insurers, and would not have acted as they did if they had known of the concealed and suppressed facts.

156.   Foo Fighters suffered damage as a result of the concealment and suppression of facts by Robertson Taylor.

**EIGHTH CLAIM**

**NEGLIGENCE**

**AGAINST ROBERTSON TAYLOR**

157.   Foo Fighters repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

158.   Each of the Robertson Taylor defendants had a duty to act as a reasonable insurance broker and as an agent for Foo Fighters with respect to the Policies, including but not limited to acting on behalf of and for the benefit of Foo Fighters, not the Insurers, in purchasing coverage, negotiating endorsements to those Policies, and in administering Foo Fighters' claims under the Policies.

159.   Each of the Robertson Taylor defendants breached its duty to Foo Fighters by, *inter alia*, acting without due care with respect to its acts and omissions as a broker between Foo Fighters and London Market Insurers  as set forth in detail herein.

160.   As a result of Robertson Taylor's negligent acts and omissions, Foo Fighters have incurred damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests a trial by jury and demands judgment against the Defendants as follows:

1.   With respect to the First Claim, a declaration concerning the parties' rights and obligations concerning coverage under the Cancellation Policy.

2.   With respect to the Second Claim, a declaration concerning the parties' rights and obligations concerning coverage under the Terrorism Policy.

3.   With respect to the Third Claim, damages in an amount to be proved at trial.

4.   With respect to the Fourth Claim, damages in an amount to be proved at trial.

5.   With respect to the Fifth Claim:

    a.   Damages in an amount to be proved at trial;

    b.   Attorney fees and costs incurred in obtaining the benefits due under the Policies in an amount to be proved at trial;

    c.   Interest on such damages, attorney fees and costs; and

    d.   Punitive damages in an amount to be determined at the time of trial.

6.   With respect to the Sixth through Eighth Claims, damages in an amount to be proved at trial, and punitive damages.

7.    With respect to all claims, Plaintiff's costs of suit incurred herein, and such other relief as the Court may deem just and proper.

8.    For such other legal and equitable relief as the Court may deem just and proper.

## **JURY TRIAL DEMAND**

Pursuant to Fed. R. Civ. P. 38, Plaintiff hereby demands a trial by jury on all claims so triable.


Dated:  June 13, 2016                          Respectfully submitted,

                                               COVINGTON & BURLING LLP


                                        By:    /s/ Reynold L. Siemens
                                               REYNOLD L. SIEMENS
                                               *Attorneys for Plaintiff*
                                               FOO FIGHTERS, L.L.C.